UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AYOTUNJI AKINLAWON,

                                        Plaintiff,

        v.

E.J. POLONCO, *et al.*,

                                        Defendants.

---

No. 21-CV-2621 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances</u>:

Ayotunji Akinlawon
Attica, NY
*Pro Se Plaintiff*

Wesley E. Bauman, Esq.
Office of the New York Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Ayotunji Akinlawon ("Plaintiff") proceeding pro se, brings this Action against Sgt. E.J.

Polonco ("Polonco"), Corrections Officer ("C.O.") A.J. Colombos ("Colombos"), C.O. Baggot

("Baggot"), C.O. Robinson ("Robinson"), C.O. Matthews ("Matthews"), Sgt. McCray

("McCray"), C.O. Santiago ("Santiago"), Lt. Anspach ("Anspach"), Lt. Ciorciari ("Ciorciari"),

C.O. Hulsair ("Hulsair"), Superintendent Russo ("Russo"), First Deputy Johnson ("Johnson"),

C.O. Everly ("Everly"), C.O. Morel ("Morel"), Sgt. Gunset ("Gunset"), Acting Director of New

York State Department of Corrections and Community Supervision ("DOCCS") Anthony

Annucci ("Annucci"), C.O. Young ("Young"), Sgt. Rossy ("Rossy"), C.O. Gleason ("Gleason"),

Capt. Bey ("Bey"), C.O. Rodriguez ("Rodriguez"), and Sgt. DeCicco ("DeCicco"), and

unidentified defendant John Doe # 1 ("Doe # 1") (collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, alleging that Defendants, both in their individual and official capacities, violated his rights under the First, Fourth, Fifth, and Eighth Amendments.  (*See* Compl. 18 (Dkt. No. 2).)[1] Before the Court is the Defendants' Motion To Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Not. of Mot. (Dkt. No. 72).)  For the following reasons, the Motion is granted in part and denied in part.

## I.  Background

### A.  Materials Considered

Plaintiff has attached several exhibits to his Complaint, (Compl. 26–64), and Defendants have attached two declarations in support of their Motion To Dismiss.  (*See* Decl. of Rachael Seguin ("Seguin Decl.") (Dkt. No. 73-1); Decl. of Laura Stanaway ("Stanaway Decl.") (Dkt. No. 73-2).)[2]

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the Complaint would convert the Rule 12(b)(6) motion into one for summary judgment pursuant to [Rule] 56."  *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken, would not convert the

---

[1] In the Complaint, Plaintiff refers to DeCicco as "Disico[,]" (Compl. 5, 6, 21); Morel as "Moreal[,]" (*id*.); Rossy as "Rossi[,]"(*id*. at 4, 6, 21); and Everly as "Evely[,]" (*id*. at 3, 6, 21).

[2] Defendants have requested that the Court convert their Motion To Dismiss for failure to exhaust to a Motion for Summary Judgment on that issue because they have properly served Plaintiff with a Local Rule 12.1 Notice.  (Mem. of Law in Supp. of Mot. To Dismiss ("Defs' Mem.") 13 (Dkt. No. 73).)  However, the Court denies Defendants' request because, as discussed herein, the Court may take judicial notice of the records Defendants have attached to their Motion.

motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . ., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

"[A] court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

Additionally, when reviewing a complaint submitted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including "documents that a pro se

litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at

*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in

response to [a defendant's] request for a pre-motion conference," *Jones v. Fed. Bureau of

Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), "documents

either in [the plaintiff's] possession or of which [the] plaintiff[] had knowledge and relied on in

bringing suit," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotation

marks omitted), and "[plaintiff's] opposition memorandum," *Gadson v. Goord*, No. 96-CV-7544,

1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997).

Because Plaintiff is proceeding pro se, the Court will consider the documents attached to

his Complaint.  (*See* Compl. 26–64.)  *See Barkai v. Mendez*, 629 F. Supp. 3d 166, 175 (S.D.N.Y.

2022) (considering exhibits attached to pro se complaint when deciding motion to dismiss).

Defendants have included two declarations in support of their Motion.  First, Defendants

have included a declaration from Rachael Seguin, the Acting Director of the Incarcerated

Grievance Program for the New York State Department of Corrections and Community

Supervision ("DOCCS"), that summarizes the records of Plaintiff's grievances in her office's

possession.  (Seguin Decl. ¶ 1.)  Second, Defendants have included a declaration from Laura

Stanaway, Incarcerated Grievance Program Supervisor at Green Haven Correctional Facility

("Green Haven"), that summarizes the records of Plaintiff's grievances in her office's

possession.  (Stanaway Decl. ¶ 1.)  In suits brought pro se by incarcerated individuals, courts in

this District routinely take judicial notice of the records of administrative bodies charged with

administering prison grievance programs.  *See Moreau v. Peterson*, No. 14-CV-201, 2015 WL

4272024, at *3 (S.D.N.Y. July 13, 2015) ("Where . . . exhaustion of administrative remedies is a

prerequisite to bringing suit, a court may take judicial notice of the records and reports of the

relevant administrative bodies . . . ." (internal quotation marks and citation omitted)); *Moor v. Fischer*, No. 10-CV-4038, 2011 WL 2988527, at *2 (S.D.N.Y. July 22, 2011) ("Here, this [c]ourt takes judicial notice of the records maintained by DOC[C]S in connection with the Inmate Grievance Program[.]").  Thus, the Court will do so here.

B.  Factual Background

The following facts are taken from Plaintiff's Complaint and are assumed to be true for the purposes of ruling on the instant Motion.  *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

At all times relevant to the instant Action, Plaintiff was an inmate of Green Haven Correctional Facility ("Green Haven"), located in Stormville, NY.  (*See* Compl. 1, 7.)  All of the Defendants except Annucci appear to be officers, supervisors, or medical personnel employed by Green Haven.  (*See id*. at 1–5.)  Annucci is the Acting Commissioner of DOCCS and does not work at Green Haven.  (*See id*. at 4.)

1.  December 14, 2019 Incident

On December 14, 2019, Matthews stopped Plaintiff at a checkpoint.  (*See* Compl. 8–9.)  Plaintiff provided his hall pass, but Matthews indicated Plaintiff needed to provide his I.D. card.  (*Id*. at 8.)  Matthews "snatched" Plaintiff's I.D. card and, after Matthews looked at it, Plaintiff "snatched" it back.  (*Id*.)  Matthews then said "I[']m going to get your head bust open when you come back."  (*Id*.)  On his way back from the package room, Plaintiff again encountered Matthews.  (*Id*.)  Plaintiff told her that he "apologize[d] but . . . didn't appreciate the disrespect." (*Id*.)  Matthews told Plaintiff to stop around the corner in front of the mess hall door.  (*See id*.)

When Plaintiff arrived in front of the mess hall door, DeCicco was standing there.  (*See id*.)  At this point, Plaintiff was in a vestibule alone with a number of officers and another inmate.  (*Id*.)  Matthews turned off her body camera and told the other inmate to "go ahead."

(*Id.*)[3]  Plaintiff alleges he was under a "pending threat[,]" but that "[a]fter words were exchanged[,]" an unidentified officer let Plaintiff leave.  (*Id.*)  DeCicco told Plaintiff that "the only way [Plaintiff] would get out of this jail was in the hospital[.]"  (*Id.*)

Plaintiff alleges that once in his cell block Matthews screamed "You['re] a fucking rat" at Plaintiff as they walked back to Plaintiff's cell, and hundreds of prisoners heard her statement. (*Id.*)  Plaintiff was then placed under 72-hour investigation for his safety, which meant that Plaintiff was not allowed to use the phone, shower, or have recreational time.  (*Id.*)  During this period, Plaintiff's cell was opened, and he was "attacked . . . [and] then pepper sprayed" by unidentified officers.  (*Id.* at 8–9.)  As a result, Plaintiff was brought to the infirmary.  (*Id.* at 9) Polonco, with the help of Morel, convinced the nurses to wipe the "blood from the holes in [Plaintiff]" before they took photos.  (*Id.*)  Polonco told Plaintiff, "[y]ou violated . . . Matthews[.] That[']s why we got you [h]it[.]  [N]ow your stay here is going to be hell[.]  I[']m sending you to my boy right here his name is [Morel][.]  He's gonna do you next[,] and this is just the beginning."  (*See id.*)

### 2.  January 12, 2020 Incident

On January 12, 2020, other inmates became upset that they were not being let out of their cells and thus set fires in their cells.  (Compl. 9.)  Morel "picked [Plaintiff] as a[n] herb [sic] and sprayed [Plaintiff's] entire cell with the fire extinguisher."  (*Id.*)  Plaintiff alleges he was hit in his "face, eyeballs, nose and mouth" with the fire extinguisher's spray.  (*Id.*)  Morel told Plaintiff "That's an old trick, I run this over here[.]  Get out of line[,] I will get you assaulted again[.]  I hate you black people."  (*Id.*)

---

[3] Plaintiff alleges that DeCicco's body camera remained on.  (Compl. 8.)  It is unclear from Plaintiff's allegations when Matthews arrived in the vestibule.  (*See generally id.*)

### 3.  May 28, 2020 Incident

On May 28, 2020, Everly had Plaintiff's cell opened, "choked [Plaintiff] up[,]" and told him to stop having a sexual relationship with Young.  (Compl. 9.)[4]  Everly then held a knife up to Plaintiff's face and told Plaintiff that Polonco would have him attacked again.  (*Id*.)[5]  Everly then punched Plaintiff in the mouth and, after leaving Plaintiff's cell, stated that if Plaintiff did not provide information or money to Polonco, "Polonco has something for you [that] you won't forget."  (*Id*.)

### 4.  June 17, 2020 Incident

On June 17, 2020, Plaintiff was attacked by another inmate in the East Dirt Yard.  (Compl. 9.)  Colombos took Plaintiff down and sprayed him.  (*Id*. at 9–10.)  Plaintiff was taken to the infirmary where Colombos said, "I [h]it hard[,] don't I?  If I were you I[']d pay that $1,000 to [Polonco] through [Everly] or I[']m gonna take care of you personally[.]"  (*Id*. at 10)  Plaintiff alleges that while Colombos made these statements, he grabbed "his crotch and licked his lips." (*Id.*)

### 5.  July 28, 2020 Incident

On July, 28, 2020, Colombos and Robinson stood in front of Plaintiff's cell and had Baggot open the cell.  (Compl. 10.)  Colombos said, "your time has expired."  (*Id*.)  Colombos then forced Plaintiff to perform oral sex on him and Plaintiff threw up.  (*Id*.)  Colombos also

---

[4] Plaintiff alleges he was having a consensual sexual relationship with Young during March, April and May of 2020.  (Compl. 9.)

[5] Plaintiff has attached a notarized declaration from another prisoner to his Complaint. (Compl. 28.)  The declaration states that on February 5, 2020, two unidentified officers approached Plaintiff's cell in the Special Housing Unit ("S.H.U."), pulled out a knife and "told [Plaintiff] if he didn't plea[d] guilty and say he did some or all of the charges they'll kill him." (*Id*.)  Plaintiff does not otherwise reference the declaration or this alleged incident in his Complaint, so the Court will not discuss the incident further.

inserted his penis into Plaintiff's rectum.  (*Id.*)  Robinson held the gate open for Colombos as he left Plaintiff's cell and then closed the gate.  (*Id.*)  Later, Baggot opened Plaintiff's cell and ordered him to "pass the ice out[.]"  (*Id.*)  Plaintiff reported to her that he had been raped by Colombos.  (*Id.*)  Baggot said, "I know[,] I[']m the one who opened your cell for him to do it[.] Now pass the ice out and act like it didn't happen or we will kill you."  (*Id.*)

After Plaintiff passed the ice out, Baggot came back to his cell and said "[l]isten[,] what they did was wrong but I can[']t go against them[.] . . . [T]hey gave me orders not to let you out of your cell tonight so you don't blow the incident up . . . ."  (*Id.*)  Plaintiff then had an anxiety attack with chest pain.  (*See id.*)  Another inmate ran and got Baggot, who said she was calling medical because she did not want Plaintiff to die while she was on duty with Colombos's DNA in his body.  (*Id.* at 10–11.)

At medical, Plaintiff reported that he had been raped and asked to be tested for STDs and HIV, and for a rape kit to be collected.  (*See id.* at 11, 18.)  The unidentified medical provider, who Plaintiff has identified as Doe # 1, did not get Plaintiff tested or complete an examination. (*Id.* at 18.)  Plaintiff was informed that he was "set to go to Westchester."  (*Id.* at 11.)

Ciorciari then came into medical and told Plaintiff "you[']re not going anywhere but back to your cell . . . ."  (*Id.*)  Plaintiff was sent back to his cell and started to have suicidal thoughts. (*Id.*)  Polonco came to Plaintiff's cell and told Plaintiff that he could not leave his cell for any reason.  (*Id.*)  Plaintiff spit in Polonco's face and proceeded to swallow metal as Polonco and Gleason watched.  (*Id.*)[6]  Plaintiff was then sent to suicide watch where he threw up blood, which

---

[6] On July 31, 2020, Polonco filed a misbehavior report, which Plaintiff has attached to his Complaint.  (*See* Compl. Ex. H at 62–64.)  The report states that Polonco and Gleason reported to Plaintiff's cell because he had made "threats of self-harm."  (*See* Compl. Ex. H at 64.) Polonco states that Plaintiff propelled an "odorless, liquid substance" toward Polonco and Gleason which struck them both in the face and chest.  (*Id.*)  Polonco states he asked Plaintiff

resulted in medical being called.  (*Id.*)  Plaintiff was taken to the infirmary, and Polonco then

came in and told the staff not to send Plaintiff out of Green Haven.  (*Id.*)  Plaintiff was sent back

to "the cell[,]" and two days later was still throwing up blood.  (*Id.*)  Plaintiff informed mental

health and received an x-ray that showed metal.  (*Id.*)  Plaintiff was then sent to an outside

hospital.  (*Id.*)

### 6.  September 3, 2020 Incident

On September 3, 2020, Polonco came near Plaintiff's cell and started talking with

McCray; other officers also showed up.  (Compl. 11.)  They then opened Plaintiff's cell door,

and Santiago "came into [Plaintiff's] cell[,] pepper sprayed [him], [and] beat [him] down" while

Polonco and McCray watched.  (*Id.*)[7]  Bey came over to Plaintiff's cell and told him he should

pay the $1,000 he owed Polonco.  (*Id.*)

### 7.  December 1, 2020 Incident

Plaintiff alleges that on November 27, 2020, the "misbehavior report got expunged from

the incident with Santiago[.]"  (Compl. 12.)  Plaintiff further alleges that on December 1, 2020

he was denied his legal call and an unidentified person told Plaintiff, "I guess you got a ticket

---

questions but did not get a reply.  (*Id.*)  Polonco states that Plaintiff made actions of swallowing "glass" but did not actually swallow anything.  (*Id.*)

[7] Santiago filed a misbehavior report following this incident, which Plaintiff has attached to his Complaint.  (*See* Compl. Ex. A at 29–32.)  In the report, Santiago states that Plaintiff was ordered to take down the sheets hanging in the cell and to get against the back wall.  (*See* Compl. Ex. A at 30.)  Plaintiff complied with the orders.  (*Id.*)  Santiago entered and asked for the sheets, which Plaintiff threw on the floor.  (*Id.*)  Plaintiff then spit on Santiago and charged him, and Santiago pepper sprayed Plaintiff.  (*Id.*)  Plaintiff grabbed Santiago's waist and slammed him to the ground.  (*Id.*)  Other correctional staff arrived and removed Santiago and brought him to medical.  (*Id.*)

Plaintiff was later found guilty of the charges Santiago filed in his report.  (*Id.*)  Plaintiff filed an appeal with the state inmate disciplinary program, which reviewed and reversed the decision made at Green Haven on November 27, 2020.  (*Id.* at 12, 32.)

Plaintiff alleges that Santiago's misbehavior report is false.  (*See* Compl. 12.)

expunged a few days ago and they don[']t want you to get the legal call[.]  Polonco is pissed[,] and Russo and Bey are trying to cut your communication[.]"  (Compl. 12.)

### 8.  December 30, 2020 Incident

On December 30, 2020, Plaintiff was attacked by two inmates in the East Weight Yard, slipped and fell, and dislocated his shoulder.  (Compl. 12.)[8]  Plaintiff was sent to the infirmary, where he asked for protective custody.  (*Id.*)  Rossy denied his request and said:

> [W]hy haven't you paid Polonco yet[,] don't you want this to end?  You have a broken arm now and Polonco still won[']t be satisfied, Colombos [raped] you, Santiago [attacked you]. . . . [G]ive us information and work for us or pay that $1,000 to Polonco.  Ma[ybe] if we let you sit here for a while and think about it[,] the pain will help make the right decision.

(*Id.*)  Plaintiff's arm was dislocated at approximately 1:30 PM, and he did not receive treatment until 11:30 PM.  (*Id.*)[9]

### 9.  January 11, 2021 Incident

On January 11, 2021, Polonco came to Plaintiff's cell and said, "You spit that nasty, [slimy], go[o]ey, lumpy, yellow, greenish, salty loogy in my face, violated Matthews, cost me money, and snitched . . . well tried to snitch.  I am going to show you how powerful I am." (Compl. 13.)  Plaintiff had an anxiety attack and chest pains and was sent to medical.  (*Id.*)[10]

---

[8] An officer filed an inmate misbehavior report after this incident.  (*See* Compl. Ex. B at 33–34.)  The reporting officer stated in his report that Plaintiff exchanged closed fist punches to the head and upper body with two other inmates.  (*Id.* at 34.)  The officer called for help and gave direct orders to stop fighting, which all of the inmates complied with.  (*Id.*)  A response team then arrived and escorted the inmates out of the area.  (*Id.*)

[9] Once Plaintiff was treated, he was sent back to his cell and placed under 72-hour investigation.  (Compl. 12.)  After the investigation, Plaintiff alleges all of the inmates in the incident were found guilty and that he remained housed in the same block as the inmates with whom he was fighting.  (*Id.*)

[10] Plaintiff alleges that he later returned to his cell where all of his clothes, sheets, legal papers were "twisted out of order" and bleach was on his clothes.  ( Compl. 13.)  Plaintiff alleges that an officer named Reyes, who he has not sued in this Action, committed these acts.  (*Id.*)

          10.  January 12, 2021 Incident

On January 12, 2021, Plaintiff alleges that Russo pulled Plaintiff aside and said:

> I have to give it to you, . . .  Polonco has never had a problem this big on his hands.
> . . .  Since he can't get the job done[,] [I']m going to take it upon myself to finish
> you myself.  You refuse to pay that $1,000 or work for us . . . I'm going to bury
> you with false reports [and] take your phones, kiosk, and rec[reation].  This [tactic]
> will be sure you work for us or pay that money or simply kill yourself.  All your
> tickets will be tier 2[']s so you won[']t enjoy the phones in the box or get
> transferred.

(Compl. 13.)  Russo then punched Plaintiff's injured shoulder and walked away, saying, "[m]y

men will be waiting for you when you get back."  (*Id.*)  Plaintiff attempted to walk back to his

cell when Hulsair stopped him and told him to go back to the mess hall.  (*Id.* at 14.)  Plaintiff

explained that he did not need to go to the mess hall because of a medical restriction and that

attendance at the mess hall during chow was not mandatory.  (*Id.*)  Hulsair pulled out his pepper

spray and stuck out his arm to prevent Plaintiff from going into his cell.  (*Id.*)[11]

        Later the same day, Colombos opened Plaintiff's cell, and Reyes "ran" in and punched

him in the mouth.  (Compl. 14.)[12]  Plaintiff alleges Reyes also put a metal knife to his face and

---

        Plaintiff has attached to his Complaint a cell frisk and contraband receipt that Reyes
submitted on January 11, 2021.  (*See* Compl. Ex. F at 48–49.)  The receipt states that no property
was damaged during the search.  (*Id.* at 49.)

    [11] Hulsair wrote an inmate behavior report about the incident, which Plaintiff has attached
to his Complaint.  (*See* Compl. Ex. D at 37–45.)  Hulsair states in his report that he stopped
Plaintiff and asked him why he was not at the mess hall for chow.  (*Id.* at 38.)  Plaintiff then
stated, "I don't have to go to chow. . . I do what I want, you can't make me do anything."  (*Id.*)
Hulsair ordered Plaintiff to go to his cell, and Plaintiff refused to provide his cell number.  (*Id.*)
Another officer identified Plaintiff's cell number to Hulsair.  (*Id.*)  When Hulsair and Plaintiff
arrived at his cell, Plaintiff attempted to close the cell door, and Hulsair grabbed the bars to
prevent the door from closing.  (*Id.*)  Plaintiff then took an aggressive stance, reached into his
sling, and told Hulsair that he was going to stab and kill him.  (*Id.*)  Hulsair secured Plaintiff in
his cell without further incident.  (*Id.*)
        Plaintiff alleges that Hulsair's report that Plaintiff threatened him is false.  (*See*
Compl. 14.)

    [12] Again, Plaintiff has not sued Reyes in this Action.

told Plaintiff that he "could kill [him] right now." (*Id.*) Colombos told Plaintiff he was not

letting Plaintiff out of his cell that night. (*Id.*)[13]

### 11.  January 13, 2021 Incident

On January 13, 2021, Plaintiff alleges that while he was walking to medical, Colombos

jumped up and said, "that[']s him right there with the sling on[,] let[']s get him[,] boys[.]"

(Compl. 14.)  Plaintiff alleges that he "refused to submit to the pat frisk[,] avoided the

harassment[,] and ran" toward a location where he knew a Sergeant was stationed.  A Sergeant

then stopped Colombos and told him he was wrong.  (*Id.*)[14]

### 12.  January 22, 2021 Incident

On January 22, 2021, Plaintiff had a legal call.  (*See* Compl.14–15, 47.)  At the end of the

call, Russo came to Plaintiff's booth.  (*See id.* at 14.)  Russo told Plaintiff: "I strongly advise you

to pay that $1,000 to Polonco or work for us as an informant . . . .  [A]ll these grievances you

keep filing [that] I keep getting are going right in the shredder." (*Id*. at 14–15.)  Plaintiff told

Russo that he would never work for him, and Russo left.  (*Id.*)

### 13.  January 30, 2021 Incident

On January 30, 2021, Plaintiff had a disciplinary hearing for misbehavior reports written

by Hulsair and Colombos.  (Compl. 15.)  As for Colombos's report, Plaintiff was found guilty of

not listening to a "direct order and [a] pat frisk." (*Id.*)  Plaintiff was sentenced to 15 "more

day[']s loss of phone" and was not given "credit" for having already gone 19 days without phone

---

[13] Plaintiff has attached to his Complaint a letter he wrote to the Inmate Grievance
Resolution Committee ("IGRC") on January 12, 2021, which describes several of the incidents
which are also described in the Complaint.  (*See* Compl. Ex. G at 53–60.)
    Plaintiff has also attached to his Complaint a handwritten FOIL request for documents
and body camera footage dated January 12, 2021.  (*See* Compl. Ex. G at 61.)

[14] Plaintiff also alleges that a misbehavior report was filed for this incident. (Compl. 14.)

use. (*Id.*)  Plaintiff objected that the sentence would result in him serving 34 days without a phone, when "the max [he could] get for a tier 2 [violation] [was] 30 days." (*Id.*)  Anspach agreed on the record with Plaintiff's objection and told Plaintiff to put in an appeal. (*Id.*)

As for the hearing on Hulsair's report, Plaintiff asked for the body camera footage from another officer named Washington's camera. (*Id.* at 16.)[15]  The footage was not available and, as a result, Washington testified. (*Id.*)  Washington said that her body camera was on at the time of the incident and that Hulsair gave Plaintiff a direct order to go to the mess hall, not to his cell as stated in Hulsair's report. (*See id.*)  Plaintiff asked to dismiss the report because of the discrepancies between Hulsair's report and Washington's testimony. (*Id.*)  Plaintiff claims that Anspach was "bias[ed]" because he relied on Hulsair's report rather than Washington's testimony, even though Washington "corroborated [Plaintiff's] version of events." (*See id.*)

After the hearing, Plaintiff returned to his cell. (*Id.*)  Bey came to Plaintiff's cell and allegedly said:

> I came here for you[.]  I just listened to the tapes with Anspach[.]  When are you going to learn?  We cut your phones off now because you keep running your . . . mouth, next we will put your mail in the shredder.  We are going to force you to kill yourself[,] you will continue to get false tickets until you break or pay that money to Polonco. . . .

(*Id.*)

### 14.  February 24, 2021 Incident

On February 24, 2021, Plaintiff was escorted to the disciplinary office, where Anspach forced Plaintiff to "perform oral sex on him" and an officer named Snow, who Plaintiff has not sued, "stuck her finger in [Plaintiff's] rectum." (Compl. 16.)  Rodriguez watched the assaults. (*See id.*)  Anspach said, "Change your . . . plea and stop pursuing a defense in this hearing.  So

---

[15] Washington is not a Party in this Action.

what[,] it[']s false[.]"  (*Id*.)  Plaintiff "came back" because he wasn't allowed "to be present at the hearing."  (*Id*.)  Plaintiff used the phone "immediately" to report the incident.  (*Id*.)

On February 25, 2021, Rodriguez came to Plaintiff's cell, took his tablet, and gave him "a disposition for 90 days loss of tablet, package, commissary, [and] keeplock."  (*Id*. at 16–17.)[16] Plaintiff alleges that this punishment was inappropriate because his disciplinary hearing was pending for 40 days due to Anspach requesting extensions to complete the hearing because a hearing officer was unavailable.  (*Id*.)  While the hearing was pending, Plaintiff was in the S.H.U. and ultimately served 70 days in the S.H.U. due to the delay in completing the hearing, even though the maximum was "30 days."  (*Id*. at 17.)

### 15.  March 2, 2021 Incident

On March 2, 2021, Plaintiff was interviewed by the "PREA" Department.  (Compl. 17.) After the interview, Plaintiff went back to his cell where Rossy said, "It's over for you, now we're gonna just end you tonight[.]  Pack your bags.  You['re] going to Clinton, Comstock or [Coxsackie] where Russo is in bed with [the] administration[,] then we are going to get you cut, stabbed[,] and force you to kill yourself."  (*Id*.)

Later that day, Colombos came to Plaintiff's cell and allegedly said:

Polonco, Reyes[,] and [I] are developing a weapon of mass destruction[.]  We are going to blow many Americans away and no one will ever suspect us until we [disappear].  So imagine what we're about to do to you[,] a worthless inmate.  If we don't kill you tonight[,] we'll be sure you get hit hard in either Clinton, Comstock, [or] Coxsackie.

---

[16] On February 25, 2021, Plaintiff received a letter from a risk management specialist at the Central New York Psychiatric Center.  (*See* Compl. Ex. G at 50–51.)  The letter was in response to a complaint that Plaintiff had submitted on February 23, 2021.  (*See id*. at 51.) According to the letter, Plaintiff was given an opportunity to speak with mental health staff at Green Haven.  (*Id*.)  The risk management specialist stated that Plaintiff's concerns about rape would be reviewed further.  (*Id*.)  Plaintiff was also directed to reach out to DOCCS about concerns regarding the correctional staff.  (*Id*.)

(*Id.*)  In the evening, Colombos "ran into" Plaintiff's cell and Gunset, who had his camera on, ordered Colombos to pepper spray Plaintiff.  (*Id.* at 17)  Plaintiff informed Gunset and Colombos that he was suicidal.  (*Id*. at 18.)  The officers took Plaintiff to the S.H.U. instead of providing mental health treatment.  (*Id.*)  Plaintiff got overwhelmed in the S.H.U., attempted to hang himself, and was then brought to an outside hospital.  (*Id.*)

### 16.  Plaintiff's Grievances

Plaintiff alleges that he has grieved all of the claims he raises in his Complaint. (Compl. 19.)  However, Plaintiff alleges that he received "no response" to the grievances and "[Russo] told me he was shredding [the grievances]."  (*Id.*)  Plaintiff alleges that he did not appeal any of his grievances because he "never got a grievance number [so he] had no decision to appeal," but that he did send "a copy of all grievances to C.O.R.C. explaining to them that [he] was trying to appeal[.]"  (*Id.*)  Plaintiff alleges that he also informed "O.S.I." of his claims.  (*Id.*) Finally, Plaintiff alleges:

> I have done everything in my power to exhaust my remedies[,] even sending my grievances to outside entities so they can forward them to the facility so it can be documented only to have my mail played with[.]  Once I retrieve [a]ll of my grievances from [the] outside entity[,] I will submit them to the court[] . . . to review . . .[,] [a]s well as the letter to the Appeal[.]

(*Id.*)

Plaintiff has also attached a grievance, dated January 12, 2021 and addressed to "I.G.R.C.[,]" (Compl. Ex. G at 53–60), which he alleges he "filed at the facility[,]" (*id.* at 50). Plaintiff alleges that he also sent this grievance to the Central New York Psychiatric Center ("CNYPC").  (*See id.* at 51–52)  Plaintiff has attached a response letter from CNYPC that states that Plaintiff's "letter was forwarded to appropriate [DOCCS] personnel at your facility."  (*Id.* at 51.)  The letter additionally states that "[i]n regard to your Prison Rape Elimination Act

["PREA"] concerns, due to the nature of your allegations, your letter has been forwarded to the appropriate personnel for further review." (*Id.*)

Green Haven's records indicate that from December 14, 2019 through March 2, 2021, Plaintiff filed four grievances. (Stanaway Decl. ¶¶ 10–14.)[17]

On December 14, 2019, Plaintiff filed a grievance concerning events that Plaintiff has described in his Complaint involving Matthews and DeCicco. (*See* Stanaway Decl. Ex. C at 31–33.) *See also* § I.B.1 *supra*. Plaintiff's grievance was investigated and Russo denied the grievance on March 27, 2020. (*Id.* at 27.)

On January 3, 2020, Plaintiff filed a grievance that he was experiencing abdominal pain and had "blood in [his] sperm" and had not received treatment. (Stanaway Decl. Ex. D at 43.) Plaintiff also alleged that "there has . . . been massive blood in my stool for months ever since an incident with an officer." (*Id.*) The IGRC recommended that Plaintiff receive proper medical treatment. (*Id.* at 41.)

On February 23, 2020, Plaintiff filed another grievance alleging he was experiencing abdominal and testicular pain and had not received treatment. (Stanaway Decl. Ex. E at 48.) The IGRC again recommended that Plaintiff receive proper medical treatment. (*Id.* at 46.)

On November 2, 2020, Plaintiff filed a grievance alleging that he had slipped and fallen in the shower and requesting that shower mats be installed in the showers. (Stanaway Decl. Ex. F at 53–54.) The IGRC recommended that shower mats be installed. (*Id.* at 60.)

---

[17] Defendants have also included Plaintiff's DOCCS Central Office Review Committee ("CORC") records, but the only appeals for which they have records involve grievances Plaintiff filed while incarcerated at other facilities prior to being incarcerated at Green Haven. (Seguin Decl. ¶ 14; *see also id.* Ex. B.)

16

### 17.  Plaintiff's Injuries

As a result of the actions described above, Plaintiff alleges, inter alia, that he has

sustained mental and emotional stress, paranoia, and headaches; that he has bled from his

rectum; that he threw up blood; and that he was pepper sprayed in the eyeballs, nose, and mouth.

(Compl. 18.)

### 18.  Plaintiff's Requested Relief

Plaintiff requests the Court enter a judgment declaring that his rights were violated under

the Constitution, award compensatory damages in the amount $3,000,000 and punitive damages

in the amount of $5,000,000 against each Defendant, and award Plaintiff his costs in litigating

this Action.  (Compl. 20.)  Plaintiff has also requested preliminary and permanent injunctions.

(*Id*.)

### 19.  Plaintiff's Causes of Action

Plaintiff asserts the following causes of action: "Eighth Amendment cruel and unusual

punishment, Right to medical care, First Amendment [right] to get reading material[] and

freedom of speech, Send and receive letters, Access to telephone, Fourth Amendment

unreasonable searches and seizures, Fifth Amendment Due process."  (Compl. 18.)  The Court

construes those claims as follows:

- December 14, 2019
  - a verbal harassment claim against Matthews for threatening Plaintiff ("Claim 1");
  - a verbal harassment claim against DeCicco for threatening Plaintiff ("Claim 2");
  - a failure to protect claim against Matthews for calling Plaintiff a "rat" in front of other inmates ("Claim 3");
  - a claim against Polonco and Morel for deliberate indifference to Plaintiff's medical needs ("Claim 4" & "Claim 5");
  - a verbal harassment claim against Polonco for threatening that Plaintiff would be harmed ("Claim 6");
- January 12, 2020
  - a claim against Morel for use of excessive force for spraying Plaintiff with the fire extinguisher ("Claim 7");

- o a claim against Morel for an equal protection violation based on Morel's statement, made after he sprayed Plaintiff, that he "hated black people," ("Claim 8");
- May 28, 2020
  - o a claim against Everly for use of excessive force for choking, punching, and verbally threatening Plaintiff ("Claim 9");
- June 17, 2020
  - o a claim against Colombos for use of excessive force for taking Plaintiff down and spraying him ("Claim 10");
  - o a verbal harassment claim against Colombos for threatening Plaintiff ("Claim 11");
- July 28, 2020
  - o a claim against Colombos for sexually assaulting Plaintiff ("Claim 12");
  - o a claim against Baggot for sexual assault because Baggot opened Plaintiff's cell for Colombos, knowing that Colombos would assault Plaintiff ("Claim 13");
  - o a failure to intervene claim against Robinson for failing to prevent or halt Colombos's sexual assault of Plaintiff ("Claim 14");
  - o a verbal harassment claim against Baggot for threatening Plaintiff ("Claim 15");
  - o a deliberate indifference to medical needs claim against Doe #1 for denying Plaintiff's request for STD testing and collection of a rape kit ("Claim 16");
  - o a deliberate indifference to medical needs claim against Ciorciari for sending Plaintiff back to his cell instead of allowing Plaintiff to be taken to an outside medical facility after being sexually assaulted ("Claim 17");
  - o a claim against Polonco and Gleason for failing to intervene when Plaintiff allegedly swallowed metal ("Claim 18");
  - o a claim against Polonco for deliberate indifference to medical needs for directing medical staff to not send Plaintiff out of Green Haven for treatment to remove the metal that Plaintiff had swallowed ("Claim 19");
- September 3, 2020
  - o an excessive force claim against Santiago for pepper spraying and beating Plaintiff ("Claim 20");
  - o a failure to intervene claim against Polonco and McCray for not acting to prevent or stop Santiago's attack ("Claim 21" and "Claim 22");
  - o a claim against Santiago for filing a false misbehavior report ("Claim 23");
- December 1, 2020
  - o a claim for interference with access to the courts against Bey and Russo because they prevented Plaintiff from making a legal call ("Claim 24" & "Claim 25");
- December 30, 2020
  - o a claim against Rossy for denying Plaintiff's request to be placed in protective custody ("Claim 26");
  - o a verbal harassment claim against Rossy for threatening Plaintiff ("Claim 27")
  - o a claim against Rossy for deliberate indifference to Plaintiff's medical needs for delaying treatment of Plaintiff's dislocated shoulder ("Claim 28");

- January 11, 2021[18]
  - a verbal harassment claim against Polonco for his threatening comments ("Claim 29");
- January 12, 2021
  - an excessive force claim against Russo for threatening Plaintiff and punching him on his injured shoulder ("Claim 30");
  - a claim against Hulsair for filing a false misbehavior report ("Claim 31");
  - a claim against Colombos for excessive force because Colombos opened Plaintiff's cell for Reyes, knowing that Reyes would assault Plaintiff ("Claim 32");[19]
- January 13, 2021
  - a verbal harassment claim against Colombos ("Claim 33");
- January 22, 2021
  - a verbal harassment claim against Russo ("Claim 34");
- January 30, 2021
  - a claim against Anspach for excessive punishment in violation of DOCCS policies resulting from his disciplinary hearing for Colombos's misbehavior report ("Claim 35");
  - a claim against Anspach based on his alleged bias during the disciplinary hearing arising from Hulsair's misbehavior report ("Claim 36");
  - a verbal harassment claim against Bey ("Claim 37");
- February 24, 2021
  - a claim for sexual assault against Anspach ("Claim 38");[20]
  - a failure to intervene claim against Rodriguez ("Claim 39");
- February 25, 2021
  - a claim against Anspach for delay in concluding Plaintiff's disciplinary hearing ("Claim 40");
- March 2, 2021
  - a verbal harassment claim against Rossy ("Claim 41");
  - a verbal harassment claim against Colombos ("Claim 42");
  - a verbal harassment claim against Gunset for ordering Colombos to pepper spray Plaintiff ("Claim 43");
  - a claim of deliberate indifference to medical needs for Gunset and Colombos's failure to provide Plaintiff mental health treatment ("Claim 44" & "Claim 45").

---

[18]  Plaintiff alleges that Reyes, an officer not named as a defendant in this Action, destroyed his property during a cell search on January 11, 2021.  Because Plaintiff has not named Reyes as a defendant, the Court will not address this claim.

[19] Because Plaintiff has not named Reyes as a defendant, the Court will not address this claim as it relates to him.

[20] Plaintiff alleges that Snow also sexually assaulted him but has not sued her in this Action.

C.  Procedural History

The Court has discussed the procedural background of this Action in a previous Order. (*See* Order (Dkt. No. 66).)  The Court discusses subsequent proceedings only as relevant to deciding the instant Motion.

On November 3, 2022, Defendants submitted a letter to the Court requesting to renew their Motion To Dismiss because Plaintiff, after requesting and receiving an extension, (Dkt. Nos. 67–68), had failed to comply with the Court's Order to file an amended complaint by October 20, 2022, (*see* Letter from John R. Doran, Esq. to Court (November 3, 2022) (Dkt. No. 69).)  The Court granted Defendants' request.  (*See* Order (Dkt. No. 70).)

Defendants filed their Motion To Dismiss and accompanying papers on November 18, 2022.  (Not. of Mot.; Defs' Mem.; Not. to Pro Se Litigant (Dkt. No. 74).)  On January 20, 2023, Defendants filed a letter to the Court requesting that their Motion be deemed fully submitted because Plaintiff had failed to file opposition papers.  (*See* Letter from Wesley E. Bauman, Esq. to Court (January 20, 2023) (Dkt. No. 81).)  The Court granted Defendants' request on January 25, 2023.  (*See* Order (Dkt. No. 82).)

II.  Discussion

A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of [its] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does

20

a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id*. at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).  Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial

notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)

(citation and quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317

(S.D.N.Y. 2016) (same).  However, when the complaint is from a pro se plaintiff, the Court may

consider "materials outside the complaint to the extent that they are consistent with the

allegations in the complaint," *Alsaifullah*, 2013 WL 3972514, at *4 n.3 (quotation marks

omitted), including "documents that a pro se litigant attaches to his opposition papers," *Agu*,

2010 WL 5186839, at *4 n.6 (italics omitted), statements by the plaintiff "submitted in response

to [a defendant's] request for a pre-motion conference," *Jones*, 2013 WL 5300721, at *2,

"documents either in [the plaintiff's] possession or of which [the] plaintiff[] had knowledge and

relied on in bringing suit," *Chambers*, 282 F.3d at 153 (quotation marks omitted), and

"[plaintiff's] opposition memorandum," *Gadson*, 1997 WL 714878, at *1 n.2.

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [the plaintiff's]

[complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]."

*Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (citation omitted).  However, "the liberal

treatment afforded to pro se litigants does not exempt a pro se party from compliance with

relevant rules of procedural and substantive law."  *Bell v. Jendell*, 980 F. Supp. 2d 555, 559

(S.D.N.Y. 2013) (citation and quotation marks omitted); *see also Caidor v. Onondaga County*,

517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves

regarding procedural rules and to comply with them." (italics and citation omitted)).

B.  Analysis

1.  Exhaustion

Defendants argue that most of Plaintiff's claims must be dismissed because he failed to

properly file and exhaust his grievances.  (Defs' Mem. 15–18.)  Defendants argue that to the

extent that Plaintiff alleges that he filed any grievances related to the conduct at issue in the

Complaint, his failure to fully exhaust those grievances should bar his claim. (*Id.* at 16–17.)

Defendants additionally argue that, to the extent that Plaintiff alleges that grievances he filed

were destroyed by one or more of the Defendants, those allegations are conclusory and, in the

alternative, Plaintiff was required to appeal the non-response to CORC. (*Id.* at 17–18.) Finally,

Defendants assert that Plaintiff's allegations that he sent letters concerning his grievances to

outside entities are also insufficient to exhaust his claims. (*Id.* at 18.)

### a.  General Requirements

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought

with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory':

An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action)

absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638

(2016) (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)). This requirement applies to "all

inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 532 (2002), "regardless of the

relief offered through administrative procedures," *Booth v. Churner*, 532 U.S. 731, 741 (2001).

Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison

grievance system holds out, and doing so *properly* . . . . Proper exhaustion demands compliance

with a prison grievance system's deadlines and other critical procedural rules." *Williams v.

Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (alterations, citations, and quotation marks omitted)

(emphasis in original).

To satisfy the exhaustion requirements, a prisoner "must exhaust all levels" of DOCCS's

"Inmate Grievance Program" ("IGP"). *Little v. Mun. Corp., City of N.Y.*, No. 12-CV-5851, 2017

WL 1184326, at *11 (S.D.N.Y. Mar. 29, 2017). The IGP provides for a three-step grievance

process.  *See* 7 N.Y.C.R.R. § 701 *et seq.*; *see also Abdallah v. Ragner*, No. 12-CV-8840, 2013 WL 7118083, at *2 (S.D.N.Y. Nov. 22, 2013) (noting that "[DOCCS] provides an administrative remedy for many prisoners' claims," which is "a grievance system available to prisoners in custody at state prisons" (citing 7 N.Y.C.R.R. § 701.1(c))).  Under the framework used in typical cases, an inmate must first file a complaint at the facility where the inmate is housed within 21 calendar days of an alleged occurrence.  *See* 7 N.Y.C.R.R. § 701.5(a)(1).  Once filed, the representatives of the IGRC have up to 16 calendar days to resolve the grievance informally.  *Id.* § 701.5(b)(1).  If the matter is not satisfactorily resolved, the IGRC conducts a hearing to either answer the grievance or make a recommendation to the superintendent, *id.* § 701.5(b)(2)(i), which is scheduled within 16 days after receipt of the grievance, *id.* § 701.5(b)(2)(ii).  The second step in the tripartite framework is for the grievant or any direct party to appeal the IGRC's decision to the prison superintendent within seven calendar days after receipt of the IGRC's written response, although the appealing party can seek an exception to the time limit. *See id.* § 701.5(c)(1).  The third and final step is to appeal the superintendent's decision to the CORC, which the prisoner must do within seven days of the superintendent's written response to the grievance.  *Id.* § 701.5(d)(1)(i).  Here, too, an inmate may request an exception to the time limit.  *See id.*  Given the aforementioned requirement to exhaust all levels of administrative remedies, *see Little*, 2017 WL 1184326, at *11, "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted," *Gardner v. Daddezio*, No. 07-CV-7201, 2008 WL 4826025, at *2 (S.D.N.Y. Nov. 5, 2008).

However, the PLRA "contains its own, textual exception to mandatory exhaustion." *Ross*, 578 U.S. at 642.  As the Supreme Court has explained "the exhaustion requirement hinges on the "'availab[ility]' of administrative remedies . . . .  [A]n inmate is required to exhaust those,

24

but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"  *Id.* (quoting *Booth*, 532 U.S. at 738).

The Supreme Court has identified at least "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 643.  First, an "administrative procedure is unavailable when . . . it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.*  Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.  In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it."  *Id.* at 643–44.  Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 644.  The Second Circuit has noted "that the three circumstances discussed in *Ross* do not appear to be exhaustive," but has declined to "opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use."  *Williams*, 829 F.3d at 123 n.2.  Nonetheless, these three circumstances "guide the Court's inquiry."  *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

### b.  Requirements for Grievances Concerning Sexual Assault

Notwithstanding the PLRA and DOCCS's general framework, "for complaints regarding sexual abuse or harassment, DOCCS has established a different procedure."  *Sheffer v. Fleury*, No. 18-CV-1180, 2019 WL 4463672, at *4 (N.D.N.Y. Sept. 18, 2019) (citing DOCCS Directive 4040 § 701.3(i); 7 N.Y.C.R.R. § 701.3(i)).  Revised in 2014 pursuant to PREA, *see Henderson v. Annucci*, No. 14-CV-445, 2016 WL 3039687, at *3 (W.D.N.Y. Mar. 14, 2016), *report and recommendation adopted*, 2016 WL 3031353 (W.D.N.Y. May 27, 2016), 7 N.Y.C.R.R. § 701.3 creates a relaxed exhaustion requirement for allegations concerning incidents of sexual assault.

25

Specifically, "an inmate is not required to file a grievance concerning an alleged incident of sexual abuse or sexual harassment to satisfy the [PLRA] exhaustion requirement." *Id.* § 701.3(i) (citation omitted). Instead,

> any allegation concerning an incident of sexual abuse or sexual harassment shall be deemed exhausted if official documentation confirms that: [] an inmate who alleges being the victim of sexual abuse or sexual harassment reported the incident to facility staff; in writing to Central Office Staff; to any outside agency that the Department has identified as having agreed to receive and immediately forward inmate reports of sexual abuse and sexual harassment to agency officials under the PREA Standards; or to the Department's Office of the Inspector General[.]

*Id.* (citations omitted).  Thus, if an inmate files a grievance concerning sexual abuse or sexual harassment, "[t]he complaint shall be deemed exhausted upon filing." *Id.*  Finally, "[a] sexual abuse or sexual harassment complaint may be submitted at any time." *Id.*

While the Second Circuit has not spoken directly to the issue, a close reading of the regulation's text as well as the underlying rationale for the policy support reading the regulation to apply the same lowered standard to non-sexual acts done in furtherance of the sexual abuse. First, the regulation provides that the relaxed standard governs "any allegation *concerning* an incident of sexual abuse or sexual harassment." 7 N.Y.C.R.R. § 701.3(i) (emphasis added). Non-sexual acts done to enable, further, or magnify the sexual misconduct, obviously, "concern[]" that misconduct, thereby falling under this standard. Second, forcing an inmate to file separate grievances for actions that occurred simultaneously and in concert with one another would have the adverse effect of forcing an inmate to determine whether such related assaults were "sufficient under PREA prior to relying upon the language in Directive 4040[,]" and such an implied requirement would be "untenable." *Henderson*, 2016 WL 3039687, at *5.  District courts confronted with this question have concluded that any non-sexual act "intertwined" with sexual abuse is subject to the relaxed grievance standards. *See, e.g.*, *Clark v. Gardner*, No. 17-

CV-366, 2021 WL 1200328, at *27 (N.D.N.Y. Mar. 8, 2021) (quoting *Sheffer* and reaching the same conclusion), *report and recommendation adopted*, 2021 WL 1198199 (N.D.N.Y. Mar. 30, 2021); *see also Sheffer*, 2019 WL 3891143, at *5 (holding that the lesser PREA grievance standard governs the reporting of "other events which are necessarily intertwined with [sexual misconduct], such as a physical assault during the course of the abuse; the failure of correctional staff to intervene to stop the rape; or acts or failures to act making a jail official legally accountable for the sexual abuse"), *report and recommendation adopted*, 2019 WL 4463672, at *6 (N.D.N.Y. Sept. 18, 2019) (considering events that are "necessarily intertwined with the underlying sexual assault" to be subject to the "relaxed exhaustion requirement").  Thus, all non-sexual misconduct "intertwined" with any allegations of sexual assault should be considered as covered by the lenient exhaustion requirements.

### c.  Availability of Grievance Process

Defendants have argued that all of Plaintiff's claims should be barred for failure to exhaust, with the exception of Claims 12 and 38 related to Colombos's and Anspach's alleged sexual assaults on July 28, 2020 and February 24, 2021, respectively.  (Defs' Mem. 5, 10–13.) As a threshold matter, the Court construes Defendants decision not to move to dismiss these claims on the basis of failure to exhaust to also include Plaintiff's claims that are intertwined with the alleged assaults, including Claims 13–17 and 39.  *See Sheffer*, 2019 WL 3891143, at *5.

Defendants argue that Plaintiff has otherwise either failed to grieve or to exhaust his remaining claims.  (Defs' Mem. 15.)  There is no dispute that a grievance procedure exists at DOCCS; indeed Plaintiff himself has used it on at least six occasions, including filing four grievances during the events described in Plaintiff's Complaint.  (*See generally* Stanaway Decl. ¶ 10.)  Green Haven's records indicate that Plaintiff filed a grievance as to one incident that Plaintiff has also alleged in his Complaint.  (*See id.* Ex. C.)  However, there is no record of

CORC having received an appeal of any grievance regarding the allegations in the Complaint, nor of CORC having received any correspondence from Plaintiff regarding his grievance not being accepted for filing.  (*See* Seguin Decl. Ex. B.)  Accordingly, the record clearly demonstrates that Plaintiff did not exhaust all steps of the grievance process.  Once "defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors—for example, threats from correction officers— rendered a nominally available procedure unavailable as a matter of fact."  *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted).

The Court takes Plaintiff's allegation that he also attempted to file a grievance in January 2021 and his allegation that the Superintendent informed him that "all these grievances you keep filing [that] I keep getting are going right in the shredder[,]" (Compl. 14–15), as an argument that the grievance process was unavailable to him because the process "operated as a simple dead end," and was "practically speaking, incapable of use," *Ross*, 578 U.S. at 643.

To constitute an "available" remedy, a process requires only "the possibility of some relief."  *Id.* (quotation marks omitted).  Accordingly, to avoid the exhaustion requirement a plaintiff must show that the grievance process "could not lead to a change in the challenged prison policies."  *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 82 (2d Cir. 2021), *cert. denied sub nom. Green Haven Preparative Meeting v. N. Y. State Dep't of Corr. & Cmty. Supervision*, 142 S. Ct. 2676 (2022).  Indeed, the example provided by the Supreme Court in *Ross* as a dead end involved a scenario where a prison handbook directed inmates to submit grievances to a particular administrative office when, in practice, the office disclaimed the capacity to consider grievances.  *Ross*, 578 U.S. at 643.

Plaintiff filed a grievance concerning Matthews and DeCicco's conduct on December 14, 2019, and Plaintiff filed, and Green Haven accepted, additional grievances unrelated to the incidents described in Plaintiff's Complaint during 2020.  (*See generally* Seguin Decl.)  Plaintiff alleges that he attempted to file a grievance, dated January 12, 2021, (Compl. Ex. G at 53–60), with the staff at Green Haven and that he also sent the same grievance to CNYPC, which forwarded the grievance to Green Haven, (*id.* at 50–51).  Plaintiff also alleges that Russo informed him on January 22, 2021, that "I strongly advise you to pay that $1,000 to Polonco or work for us as an informant. . . . [A]ll these grievances you keep filing [that] I keep getting are going right in the shredder."  (Compl. 14–15.)  Finally, Plaintiff alleges that he "never got a grievance number [so he] had no decision to appeal" but that he did send all of his grievances to CORC in order to show that he was attempting to appeal.  (*Id.* 19.)

The Court finds that at this juncture, there are sufficient factual issues as to whether the grievance process was available to Plaintiff to preclude dismissal of his claims on the grounds of non-exhaustion.  The Court is mindful that "administrative exhaustion is not a jurisdictional predicate," instead "failure to exhaust is an affirmative defense." *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004) (citation omitted).  Taking all of Plaintiff's allegations as true, prison officials were, at points during the period described in the Complaint, not accepting or destroying his grievances and Plaintiff took steps to appeal to CORC.  (Compl. 19.)  Although Defendants are correct that CORC's records do not reflect any attempted appeals, the Court finds that Plaintiff has pled sufficient facts to indicate that one or more of the exceptions outlined by the Supreme Court in *Ross* may be applicable in this case once the factual record is more fully developed; as such, Defendants' Motion must be denied with respect to this issue.  *See*, *e.g.*, *Grant v. Kopp*, No. 17-CV-1224, 2018 WL 3014905, at *5 (N.D.N.Y. May 17, 2018) (declining to grant motion

to dismiss where plaintiff had alleged "all of his papers concerning [a] grievance were confiscated or destroyed by corrections personnel"), *report and recommendation adopted*, No. 17-CV-1224, 2018 WL 3014813 (N.D.N.Y. June 15, 2018); *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 546–47 (S.D.N.Y. 2015) (denying motion to dismiss where it was "not clear that the exceptions to the exhaustion requirement do not apply to Plaintiff[']s claim[s]"); *cf. Johnson v. Owens*, No. 20-CV-982, 2022 WL 958127, at *4 (N.D.N.Y. Mar. 30, 2022) (denying motion for summary judgment on exhaustion as premature where plaintiff alleged the grievance process was unavailable and had "not yet had an opportunity to conduct discovery to support his exhaustion theory").

### 2.  Personal Involvement

Defendants argue that Plaintiff has failed to allege the personal involvement of Annucci and Young in any violation of his constitutional rights.  (Defs' Mem. 18–20.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under [42 U.S.C.] § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit "held that 'there is no special rule for supervisory liability[,]' thereby doing away with 'the special standards for supervisory liability' . . . and clarifying that 'a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL

1164185, at *32 (S.D.N.Y. Mar. 26, 2021) (additional quotation marks omitted) (quoting *Tangreti*, 983 F.3d at 617, 618); *accord Iqbal*, 556 U.S. at 676.

Here, even taking all of Plaintiff's allegations as true and drawing all inferences in his favor, he has failed to allege the personal involvement of Annucci or Young.  Annucci is referenced only in the list of Defendants, which is plainly insufficient to demonstrate personal involvement.  (*See generally* Compl.)  Similarly, Plaintiff mentions Young in his Complaint only in reference to threats made by Everly on May 28, 2020; Plaintiff does not otherwise allege that Young injured him.  (*Id.* at 9.)  Plaintiff has thus failed to plausibly allege the personal involvement of either Annucci or Young in any constitutional violation.  *See Haywood v. Annucci*, No. 18-CV-10913, 2020 WL 5751530, at *5 (S.D.N.Y. Sept. 25, 2020) (dismissing claims against Annucci for failure to allege personal involvement when the plaintiff "offer[ed] no factual allegations suggesting that Annucci was present for, knew of, or even had any reason to know about the alleged" constitutional violation); *Falls v. Pitt*, No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation); *Lara-Grimaldi v. County of Putnam*, No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (finding personal involvement not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted" the violation).

### 3.  Due Process

Defendants argue that Claims 36 and 40 must be dismissed because Plaintiff has failed to allege a due process violation.  (Defs' Mem. 20–23.)[21]

---

[21] Defendants also argue that any claims Plaintiff has related to destruction of his property must be denied because an adequate post-deprivation remedy exists.  (Defs' Mem. 24.)

Incarceration curtails an inmate's rights, "[b]ut though his rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974). "Prisoners may also claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law." *Id.* at 556 (collecting cases). Thus, "[t]o state a due process claim, plaintiff must plausibly allege '(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.'" *Jabot v. MHU Couns. Roszel*, No. 14-CV-3951, 2016 WL 6996173, at *7 (S.D.N.Y. Nov. 29, 2016) (quoting *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)). As relevant here, "[p]rison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

As an initial matter, an inmate has "no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty

---

The Court declines to consider this argument because Plaintiff has not sued any Defendant for destruction of his property. (*See generally* Compl.)

Similarly, Defendants argue that Claim 26, resulting from Rossy's denial of Plaintiff's request to be placed in protective custody, should be dismissed because Plaintiff has no right to be housed in a particular area of a prison. (Defs' Mem. 24.) However, Defendants cite only a single case in support of this proposition, *White v. Fischer*, No. 09-CV-240, 2010 WL 624081 (N.D.N.Y. Feb. 18, 2010), which deals with a factually distinguishable scenario where the plaintiff was seeking to contest his transfer from keeplock in one facility to the S.H.U. of another facility as a denial of due process. *Id.* at *5. Here, Plaintiff alleges that he requested transfer to protective custody after being assaulted by two other inmates. (Compl. 12.) It is well-established that "prison officials are required to take reasonable measures to guarantee the safety of inmates" and that a prisoner may bring suit where prison officials' failed to protect him. *See Best v. City of New York*, No. 11-CV-4475, 2012 WL 5458054, at *7 (S.D.N.Y. Nov. 8, 2012). As such, Defendants' Motion is denied as to Claim 26.

interest[,]" rather, "due process require[s] that he be granted a hearing on whatever charges ha[ve] been made against him." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986); *see also Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (explaining that "[a] prisoner does have a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report" (citing *Freeman*, 808 F.2d at 951)).

A disciplinary hearing comports with due process when an inmate receives "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). "In the context of prison disciplinary hearings, the Second Circuit has said that its 'conception of an impartial decisionmaker is one who, inter alia, does not prejudge the evidence and who cannot say, with . . . utter certainty . . . , how he would assess evidence he has not yet seen.'" *Rahman v. Acevedo*, No. 08-CV-4368, 2011 WL 6028212, at *7 (S.D.N.Y. Dec. 5, 2011) (italics omitted) (quoting *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990)). As relevant here, "[a]dministrators serving as adjudicators are presumed to be unbiased." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996).

Finally, none of these due process rights is absolute, and accordingly they are individually and collectively subject to harmless error analysis. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("[I]t is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial."). "Courts may find harmless error where a prisoner fails to show that the error negatively affected the outcome of the proceeding, or that it impaired the prisoner's ability to prepare a defense." *Marino v. Humphrey*,

No. 05-CV-6571, 2006 WL 2786182, at *5 (S.D.N.Y. Sept. 27, 2006); *see also Brown v. Venettozzi*, No. 18-CV-2628, 2022 WL 3867958, at *8 (S.D.N.Y. Aug. 30, 2022) (concluding prison officials' failure to provide a logbook was harmless error where plaintiff had been provided the evidence he requested through other means).

Defendants assert that Claim 36 against Anspach for bias during the Hulsair misbehavior report hearing must be dismissed because Plaintiff has failed to allege any facts that support that Anspach was biased beyond Plaintiff's assertion that his decision to rely on Hulsair's report over Washington and Plaintiff's testimony could only result from bias.  (Defs' Mem. 20–21.)  The Court agrees with Defendants, as Plaintiff has failed to provide more than conclusory allegations about his perception that Anspach must have been biased because Anspach decided to reject Plaintiff's evidence and rely on Hulsair's report.  *See Brooks v. Prack*, 77 F. Supp. 3d 301, 317 (W.D.N.Y. 2014) (holding plaintiff failed to state a claim where he made only conclusory allegation that hearing officer was biased); *Edwards v. Mejia*, No. 11-CV-9134, 2013 WL 1092978, at *4 (S.D.N.Y. Mar. 15, 2013) (dismissing claims of bias where plaintiff made conclusory allegations that disciplinary hearing officer was biased and destroyed certain exculpatory evidence because of his alleged friendship with the citing officer and noting that plaintiff's ability to call witnesses was itself indicative of a fair and impartial hearing officer); *Pacheco v. Vanwyk*, No. 94-CV-456, 1997 WL 642540, at *12 (N.D.N.Y. Oct. 15, 1997) ("Plaintiff alleges that [the hearing officer] was biased.  However, there is no indication of any factual support for this assertion.  As a basis for the claim, the plaintiff merely lists the adverse rulings to which he was subjected as evidence of bias.  Simply because [the hearing officer] denied evidence or denied witnesses does not mean that he . . . prejudged the case."); *cf. Washington v. Afify*, 968 F. Supp. 2d 532, 542 (W.D.N.Y. 2013). ("In the case at bar, however,

plaintiff does more than simply allege that [the hearing officer] was biased.  He alleges that at the end of the hearing, [the hearing officer] called plaintiff 'a little monkey,' and told plaintiff that there was 'more retaliation on the way,' and that 'they were not done yet.'"); *Rahman*, 2011 WL 6028212, at *7 ("[W]hen a hearing officer states that he will not even consider evidence that a prisoner has introduced because he cannot believe that the prisoner's theory could be true, the hearing officer may be biased.").

Similarly, Defendants argue that Claim 40 against Anspach must be dismissed because Anspach's requests for extensions while completing the Hulsair hearing constituted harmless error.  (Defs' Mem. 21.)  The Court agrees with Defendants because, taking all of Plaintiff's allegations as true, he was confined in the S.H.U. for 70 days in aggregate and was subject to loss of privileges only after he began serving the sentence provided for in the disposition. (Compl. 16–17.)

The Second Circuit has defined general guidelines as to what duration of punitive confinement implicates a prisoner's constitutional rights.  *See Palmer v. Richards*, 364 F.3d 60, 64–65 (2d Cir. 2004).  As a rule, confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship."  *See Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589–90 (2d Cir. 1999)).  Loss of privileges during a period of punitive confinement is also generally not an atypical hardship.  *See Thomas v. DeCastro*, No. 14-CV-6409, 2018 WL 1322207, at *7 (S.D.N.Y. Mar. 13, 2018) (finding plaintiff was not subject to atypical hardship where he was sentenced to 60 days in the S.H.U. and the "loss of privileges such as access to the phones, packages, and commissary"); *Branch v. Goord,* 05-CV-6495, 2006 WL 2807168, at *4 (S.D.N.Y. Sept. 28, 2006) ("Plaintiff's privileges were withheld during confinement, but lost privileges do not constitute an atypical and

significant hardship because they are within the expected parameters of the sentence imposed by a court of law." (internal quotation marks omitted)).

Thus, because the duration and conditions of Plaintiff's confinement in the S.H.U. did not implicate his constitutional rights, the delay in the completion of the hearing was harmless. *See Sorrentino v. Annucci*, No. 23-CV-582, 2023 WL 4824852, at *5 (N.D.N.Y. July 27, 2023) (dismissing plaintiff's due process claim where he alleged he had spent, in aggregate, 50 days in the S.H.U. and had made no other allegations concerning the conditions of his confinement); *Elleby v. Martucello*, No. 16-CV-1335, 2018 WL 3769965, at *3 (N.D.N.Y. Aug. 9, 2018) ("The Court notes that Plaintiff was sentenced to 90 days in SHU which, without additional allegations, is insufficient to establish that he suffered from an atypical and significant confinement as required by *Sandin*.").

### 4. False Misbehavior Reports

Defendants argue that Plaintiff's Claims 23 and 31, which allege that Santiago and Hulsair filed false behavior reports against Plaintiff, must be dismissed because Plaintiff has failed to show that these reports, even if false, resulted in a deprivation of his constitutional rights. (Defs' Mem. 22–23.) The Court agrees.

"The Second Circuit has long held . . . that a prison inmate has no constitutional right to be free from being falsely accused in a misbehavior report." *Thomas v. Calero*, 824 F. Supp. 2d 488, 499 (S.D.N.Y. 2011); *see also Boddie*, 105 F.3d at 862 (same); *Freeman*, 808 F.2d at 951 (observing that a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest"). There are, however, two exceptions to this rule. A corrections officer's false misbehavior report is actionable where an inmate is "able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was

36

issued in retaliation for exercising a constitutionally protected right." *Willey v. Kirkpatrick*, 801

F.3d 51, 63 (2d Cir. 2015); *see also Cook v. Quattrocchi*, No. 19-CV-11659, 2020 WL 564082,

at *2 (S.D.N.Y. Feb. 5, 2020) (same).   As explained above, *see* § II.B.3 *supra*, Plaintiff has failed

to state an actionable due process violation.   Plaintiff has also not plausibly alleged that either

report was issued in retaliation for exercising any constitutional right.   (*See generally* Compl.)

As such, Claims 23 and 31 are dismissed.  *See Brown v. Venettozzi*, No. 18-CV-2628, 2019 WL

4194432, at *5 (S.D.N.Y. September 4, 2019) (holding that a defendant's allegedly false

misbehavior report and testimony did not violate the plaintiff's constitutional rights where the

plaintiff had not been "disciplined without adequate due process," and the plaintiff did not allege

that the false report was issued in retaliation for his exercise of a constitutionally protected

right); *Jackson v. Jackson*, No. 16-CV-8516, 2018 WL 1918626, at *3 (S.D.N.Y. Apr. 20,

2018) (holding that a plaintiff's claim "stemming from [an] allegedly false misbehavior report"

failed to state a claim "because the factual allegations d[id] not support the contention that [the]

[p]laintiff was disciplined without adequate due process as a result of the allegedly false report,

or that the report was issued in retaliation for exercising a constitutionally protected right").

### 5.  Verbal Harassment

Defendants have asserted that Plaintiff cannot state a claim for verbal harassment and, as

such, Claims 1–2, 6, 11, 15, 27, 33–34, 37, and 41–43 must be dismissed.  (Defs' Mem. 24–25.)

It is well settled that "[v]erbal harassment or threats alone do not constitute a violation of

any federally protected right and are therefore not actionable pursuant to 42 U.S.C. § 1983."

*Lawtone-Bowles v. Katz*, No. 14-CV-606, 2016 WL 6834018, at *8 n.12 (S.D.N.Y. Nov. 17,

2016); *see also Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (upholding dismissal of

"claim[] that prison guards called [the plaintiff] names," because this claim "did not allege any

appreciable injury"); *Khalil v. City of New York*, No. 17-CV-1729, 2019 WL 1597315, at *5

(E.D.N.Y. Apr. 15, 2019) ("Verbal threats alone are insufficient to give[] rise to a constitutional violation that is cognizable under § 1983.").  To state a claim under the Eighth Amendment for the infliction of psychological pain, "the psychological pain must be (1) intentionally inflicted and (2) more than de minimis in nature." *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 491 (N.D.N.Y. 2009) (italics omitted); *see also Shabazz v. Pico*, 994 F. Supp. 460, 475 (S.D.N.Y. 1998) ("Under certain circumstances, the intentional infliction of psychological pain may constitute an Eighth Amendment violation, so long as the pain is not de minimis." (italics omitted)).  Because verbal harassment claims "may be fabricated" easily, courts "approach those claims 'with skepticism and particular care.'" *Medina v. Kaplan*, No. 16-CV-7223, 2018 WL 797330, at *7 (S.D.N.Y. Feb. 8, 2018) (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)); *Torres v. UConn Health*, No. 17-CV-325, 2018 WL 2926277, at *5 (D. Conn. June 7, 2018) (same).

Liberally construed, Plaintiff alleges as to Claims 1–2, 6, 11, 15, 27, 33–34, 37, and 41 that Defendants' conduct was intentional but has made no specific allegation as to any psychological injury he suffered at the time of each of the alleged threats.  *See supra* § I.B. Without any allegation as to an injury from these isolated instances, Plaintiff's claims must fail. *See Rahim v. Martin*, No. 23-CV-298, 2023 WL 4745536, at *5 (D. Conn. July 25, 2023) (dismissing verbal harassment claims where plaintiff had "not alleged facts indicating that he sustained any harm from the verbal harassment or that any other inmates heard the verbal harassment or name calling so that it would have exposed him to danger"); *Jordan v. Tremblay*, No. 23-CV-577, 2023 WL 4684831, at *3 (D. Conn. July 21, 2023) (dismissing plaintiff's claim where he had "not alleged facts to suggest that he sustained any appreciable harm" from defendant's alleged harassment); *cf. Brown v. Cronin*, No. 17-CV-74, 2019 WL 635578, at *4

(W.D.N.Y. Feb. 14, 2019) (finding the plaintiff's claim merited dismissal where the plaintiff had alleged only that defendant's words "totally humiliated and embarrassed" him and that the plaintiff subsequently spoke with mental health professionals).

However, as to Claims 42 and 43, Plaintiff has alleged that Colombos and Gunset threatened him and that he then reported to them that he was feeling suicidal. *See supra* § I.B.15. Drawing all inferences in Plaintiff's favor, his suicidal ideation may have been caused by Colombos and Gunset's threats. Harassment that results in a suicide attempt or suicidal ideation inflicts more than a de minimis psychological injury. *See Johnson v. Cook*, No. 19-CV-1464, 2021 WL 2741723, at *10 (D. Conn. July 1, 2021) (allowing plaintiff's claim to proceed where she alleged that officers' harassment resulted in her having "suicidal thoughts"); *cf. Willey v. Kirkpatrick*, 801 F.3d 51, 70 (2d Cir. 2015) (remanding case to district court to re-evaluate claims of verbal harassment to determine whether inmate suffered an "appreciable injury" where the inmate alleged he attempted to commit suicide as a result of the harassment).

Thus, Claims 1–2, 6, 11, 15, 27, 33–34, 37, and 41 are dismissed, but Claims 42 and 43 will proceed.[22]

### 6. Deliberate Indifference to Medical Needs

Defendants have argued that Claims 19, 28, 44–45 must be dismissed because Plaintiff has failed to allege facts sufficient to state a claim for deliberate indifference to his medical

---

[22] The Court notes that these claims are dismissed because they are construed as individual instances of verbal harassment. To the extent that Plaintiff seeks to use these allegations of verbal harassment as evidence of some other constitutional violation, such as a § 1983 conspiracy to violate his rights, Plaintiff may request leave from the Court to amend his Complaint to do so.

needs.  (Defs' Mem. 25–26.)[23]  However, Defendants entirely fail to engage with Plaintiff's allegations, instead quoting generic caselaw setting out the standard for deliberate indifference and then stating that "since Plaintiff has failed to plead any non-conclusory allegations which establish a serious medical need of his was known by the Defendants and ignored, Plaintiff's medical deliberate indifference claims against [Defendants] should be dismissed."  *Id.* at 26.  The Court declines to consider these arguments "because [they are] 'not sufficiently argued' by Defendants, who are represented by counsel and attempting to dismiss a pro se Complaint." *Whitley v. Bowden*, No. 17-CV-3564, 2018 WL 2170313, at *12 (S.D.N.Y. May 10, 2018) (quoting *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998)); *see also Bonie v. Annucci*, No. 20-CV-640, 2023 WL 2711349, at *17 (S.D.N.Y. Mar. 30, 2023) (declining to consider defendant's argument for dismissal of pro se plaintiff's claim of First Amendment retaliation where it amounted to "a single three sentence paragraph" that failed to substantively engage with Plaintiff's factual averments); *cf. Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002) ("Perhaps counsel for [the] [a]ppellant intends that we form an argument for him, by looking into the record to document the 'facts' posited in his 'statement of the case,' and then examining various combinations of these facts in the light of the legal doctrines he later mentions.  But that is simply not our job, at least in a counseled case.").

### 7.  Official Capacity

Defendants argue that all of Plaintiff's claims against Defendants in their official capacities must be dismissed because they are barred by the Eleventh Amendment.  (Defs' Mem. 26–27.)  The Court agrees.

---

[23] Defendants have not addressed Claim 16 against Doe #1 or Claim 17 against Ciorciari, both of which also allege deliberate indifference to Plaintiff's medical needs.  (*See generally* Defs' Mem.)

"[A]s a general rule, state governments may not be sued in federal court unless they have

waived their Eleventh Amendment immunity, or unless Congress has abrogated the states'

Eleventh Amendment immunity . . . ." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)

(quotation marks and alteration omitted).  New York has not waived its Eleventh Amendment

immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting

42 U.S.C. § 1983.  *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir.

1977); *Dubarry v. Capra*, No. 21-CV-5487, 2021 WL 3604756, at *1 (S.D.N.Y. Aug. 13, 2021)

(same).  "[T]he immunity recognized by the Eleventh Amendment extends beyond the states

themselves to state agents and state instrumentalities that are, effectively, arms of a state."

*Gollomp*, 568 F. 3d at 366.  The Eleventh Amendment therefore also bars the claims for damages

against the individual Defendants in their official capacities.  *See Ying Jing Gan v. City of New*

*York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in

his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled

to invoke the Eleventh Amendment immunity belonging to the state.") (citing *Kentucky v.*

*Graham*, 473 U.S. 159, 166–67 (1985), *aff'd*, 589 F. App'x 28 (2d Cir. 2015)); *Leon v. Rockland*

*Psychiatric Ctr.*, 232 F. Supp. 3d 420, 436 (S.D.N.Y. 2017) (same); *Perciballi v. New York*, No.

09-CV-6933, 2010 WL 3958731, at *4 (S.D.N.Y. Sept. 28, 2010) (same).

### 8.  Injunctive Relief

Defendants argue that Plaintiff's requests for unspecified injunctive relief must be

dismissed because they have been mooted by his transfer from Green Haven to another facility.

The Court agrees.

"To obtain prospective injunctive relief, whether preliminary or permanent, a plaintiff

'cannot rely on past injury[,] but must show a likelihood that []he will be injured in the future.'"

*Johnson v. Padin*, No. 20-CV-637, 2020 WL 4818363, at *6 (D. Conn. Aug. 16, 2020) (ellipses

omitted) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)); *Kelly v. N.Y. State Civ. Serv. Comm'n*, No. 14-CV-716, 2015 WL 861744, at *4 n.4 (S.D.N.Y. Jan. 26, 2015) (same); *see also Pungitore v. Barbera*, 506 F. App'x 40, 41 (2d Cir. 2012) (summary order) ("[W]hen seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing* harm."); *Krull v. Oey*, No. 19-CV-142, 2019 WL 1207963, at *10 (N.D.N.Y. Mar. 14, 2019) (same).  Additionally, "[t]o prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint." *Candelaria v. Baker*, No. 00-CV-0912, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) (citing *McKinnon v. Tresman*, No. 02-CV-2305, 2004 WL 78091, at *1 (D. Conn. 2004)).

"It is settled in th[e] [Second] Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996); *see also Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006) ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.").  Thus, Plaintiff's claims for unspecified injunctive relief are dismissed as moot.

## III.  Conclusion

For the foregoing reasons, the Court grants Defendants' Motion To Dismiss as to Claims 1–2, 6, 11, 15, 23, 27, 31, 33–34, 36–37, and 40–41.[24]  However, in light of Plaintiff's pro se status, and because this is the first adjudication of his claims on the merits, these claims are dismissed without prejudice.  If Plaintiff wishes to file an amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiff must do so within 30

---

[24] For the avoidance of any doubt, Defendants' Motion To Dismiss is denied as to Claims 3–5, 7–10, 12–14, 16–22, 24–26, 28–30, 32, 35, 38–39, and 42–45.

days of the date of this Order.  The amended complaint will replace, not supplement, the original

complaint.  Defendants' Motion is denied as to Plaintiff's remaining claims.  Plaintiff's requests

for injunctive relief are also dismissed as moot.

Defendants Annucci and Young are dismissed for lack of personal involvement.  Also, all

claims against all Defendants in their official capacities are dismissed.

Defendants have contended that the vast majority of Plaintiff's remaining claims are

barred by his failure to exhaust his administrative remedies.  The Court directs that the Parties

propose a bifurcated discovery schedule, where discovery related to exhaustion will be taken in

the first phase.  Defendants may move for partial summary judgment on the basis of exhaustion

at the conclusion of the first phase of discovery.

The Court will hold a status conference on November 14, 2023, at 10:00 AM.  The Clerk

of Court is respectfully directed to mail a copy of this Opinion and Order to Plaintiff and

terminate the pending Motion.  (*See* Dkt. No. 72.)

SO ORDERED.

Dated:    September 25, 2023
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge